**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3555-17T1

HOMEBRIDGE FINANCIAL
SERVICES, INC.,

      Plaintiff-Appellant,

v.

MICHAEL R. SANTESSE,
DELORES SANTESSE,
THERESA HOOKS, MR.
HOOKS, husband of
THERESA HOOKS, and
SOUTH JERSEY FEDERAL
CREDIT UNION,

      Defendants,

and

NICOLE BECICA,

      Defendant-Respondent.

_____

Submitted February 13, 2019 – Decided May 1, 2020

Before Judges Fuentes and Accurso.

On appeal from the Superior Court of New Jersey, Chancery Division, Cape May County, Docket No. F-033389-15.

McCabe, Weisberg & Conway, LLC, attorneys for appellant (James A. French, of counsel and on the brief).

Respondent has not filed a brief.

The opinion of the court was delivered by

FUENTES, P.J.A.D.

In this appeal, we are asked to determine whether the General Equity judge erred in finding defendant Nicole Becica has an enforceable oral lease allowing her to occupy a residential property as a tenant. After reviewing the record developed before the court, we reverse. The competent evidence does not support the court's findings and ultimate legal conclusion that Becica occupied this property as a tenant prior to the judgment of foreclosure. The following facts are uncontested.

I

On November 6, 2012, Michael and Delores Santesse executed a promissory note to secure $247,959 they borrowed from Real Estate Mortgage Network, Inc. (REMN). As collateral for this loan, the Santesses offered real property they owned in Ocean View, an unincorporated community located

2

within Dennis Township in Cape May County. The borrowers executed a mortgage dated November 6, 2012, which was recorded as a lien against the property and delivered to the Mortgage Electronic Registration Systems, Inc. (MERS), as nominee for REMN. Unbeknownst to the mortgagee, on December 12, 2012, the Santesses transferred title of the property to their daughter Theresa Hooks, in a deed recorded in the Office of the Clerk of Cape May County on December 20, 2012. This transfer of ownership violated the terms of the mortgage document.

In November 2014, the Santesses stopped making mortgage payments and defaulted on the loan. In October 2015, the holder of the promissory note and mortgage filed this foreclosure action in the Cape May County, Chancery Division, General Equity Part. The complaint named as defendants the Santesses, Hooks, and any other party who may have had an interest in the property. When no responsive pleadings were filed contesting the foreclosure action, the court granted plaintiff's August 2016 motion to declare in default all the named parties. In September 2016, plaintiff filed a motion for a Final Judgment in Foreclosure. In October 2016, the court entered final judgment and a writ of execution directing the sale of the property at a sheriff's sale.

3

The sheriff's sale took place on July 5, 2017. Plaintiff acquired title to the property as the highest bidder and obtained a writ of possession to remove any and all occupants of the property. The sheriff was authorized to execute the writ of removal on November 9, 2017. On November 6, 2017, defendant Becica filed a pro se motion in the General Equity Part seeking a stay of the writ of removal. Becica submitted the following pro se certification in support of her motion:

> I am asking for extra time for the reason being we have 6 kids from 14 to 2[.] [T]hey are all in school involved with sports exct[.] [sic] I'm looking for another place its just harder having the children. Also . . . my husband works out of state and is only home for a week at a time. I never thought we would be in this situation[.] I'm really trying hard to find another home in or about the area to keep[.]

On November 9, 2017, the General Equity judge granted Becica's motion for a stay of removal and scheduled the matter for a hearing on December 12, 2017, "to determine if Ms. Becica has a lease on the property." The court conditioned the stay on Becica paying $1500 as "rent" on November 15, 2017, and an additional $1500 due December 1, 2017. In an order dated November 28, 2017, the court modified the November 9, 2017 order and extended the payment schedule to allow Becica "to bring the $3,000 [due] for the November and December rent to [c]ourt on December 12, 2017."

4

Becica failed to appear in court on December 12, 2017. She did not provide any explanation for her failure to appear and did not pay the $3000 ordered by the court as a condition for granting her the stay of removal from the property. The judge noted that judiciary staff called Becica before the December 12, 2017 hearing and left a voicemail message to remind her of the hearing date. Plaintiff's counsel appeared before the court on December 12, 2017, and was ready to proceed. In this light, the court vacated the stay and authorized the sheriff to execute the writ of removal on January 2, 2018.

On January 2, 2018, Becica again filed a pro se motion to stay the removal. This time, she handwrote the following statement in support of this motion:

> I am asking to please be seen again in front of [the same judge] to be able to explain the situation and to ask if the eviction could be stopped on the 4th [of January 2018]. My 6 kids and I have no [where] to go at the current time. I do have the money that was asked for prior to this date. And will continue to pay. I am begging please just that [I'm] able to not be thrown out. Please.

Becica supplemented her application with a handwritten statement dated December 15, 2017, allegedly signed by her mother Theresa Hooks and notarized on December 17, 2017, which states:

5

To Whom it may Concern,

Nicole Becica has lived at 10 Scott Lane Ocean View, NJ 08230 for the last 5 yrs. with her 6 children. She has been paying 1500.00 per mo. rent to Michael Santesse. This is her mother and the house was deeded to me. I have not lived there in over 2 yrs.

Best Regards,

Theresa Hooks 12-15-17

The court granted the stay and scheduled the matter for a proof hearing on January 4, 2018. Due to "a significant snowstorm," the court rescheduled the hearing to January 9, 2018. Only Becica and her friend Jennifer Wilson appeared to testify at the hearing. The judge recited the case's protracted procedural history and made clear that it was "Becica's burden at this hearing [to prove] that she has possession of the property pursuant to . . . the lease." The judge asked Becica if she had the $3000 he ordered her to bring to court on December 12, 2017 to cover the "rent" due for November and December. Becica claimed her "in-law's [were] actually bringing the bank check . . . It's on its way right here, right now." The judge decided to proceed with the hearing notwithstanding Becica's unjustified failure to comply with his previous order.

Becica was the first witness to testify. The judge apprised her that she had "to convince [him] by a preponderance of the evidence that [she] had

possession of this home for the last so many years . . . whatever it is, pursuant to a lease." This prompted the following colloquy between Becica and the judge:

> THE COURT: I don't think anybody contests that you've lived in the property for the past five years. The question is, if you've lived there because it's the family home and your mom and your grandfather allowed you to live there.
>
>     . . . .
>
> Or if you lived there because you were a tenant.
>
> BECICA: I lived there because that's where I came home to with my family. And they left and I continued to stay there. You know, my grandmother passed away, and like I said from the beginning, that's what that house was for, was so me and my children never had to bounce around again. And it just turned into a family mess after she passed away. It just – I don't know why it happened the way that it did, but that's what it was for from the jump with my mother involved, me involved, and my children involved.
>
> And after my grandmother died and my grandfather moved to Florida, he has just now moved back within the last month or so, he's back living with his son. You know, on this here, it does state that I've been living stated at the address as a verbal agreement between my grandfather, you know, and my mother. It's that's -- there was never any piece of paper, a lease drawn up, because I've always lived there. That's -- my grandmother died in that home, I was there when she died. I mean, this is what I have, and I don't know -- I've been there.
>
> And I have his signature. If I could get him here to testify, I would. I've never left that home, it's been my

longest home with my children. And I -- like I said before, I understand where they're coming from, I do. I do. If we're willing to get my grandfather on the phone, you know, and like I said, he is 83 years old and . . . he said, whatever he needs to do to help and his great grandchildren stay in that home, he is going to do.

Although the Santesses transferred title of the property to their daughter Theresa Hooks on December 12, 2012, Becica testified she paid rent to her grandfather Michael Santesse during the time he resided in Florida. Becica candidly admitted she was unable to honor this arrangement: "I wasn't faithfully paying because there was one income coming in, and that's my children's father. We did miss many months, I'm not denying that we didn't." The judge addressed this point directly:

> THE COURT: Well let's say you had a lease with somebody, and you lived there for five years, but you didn't pay the rent for the last year, do you think you should be able to stay there?
>
> BECICA: No, Your Honor. I'll be honest, no.
>
> THE COURT: Okay. Well that's the right answer. No, you shouldn't be able to stay there –
>
> BECICA: You're right.

Becica testified that her grandfather, Michael Santesse, never provided her any document or rent receipts that confirmed her status as a tenant.

> THE COURT: To whom did you pay the $1,500?

8

BECICA: We were sending that to Florida. We were sending that to Florida under the impression that –

THE COURT: To whom? To whom?

BECICA: To Michael Santesse. And he lived with his daughter Torina and Rich Stesney.

THE COURT: Did they ever give you a written lease?

BECICA: No, Your Honor. [Not] written[.]

THE COURT: Did Mr. Santesse or his daughter ever give you any receipts for the payments you made?

BECICA: No, Your Honor. Nothing was ever sent back.

Even more incredulous, Becica testified she mailed her $1500 rent payments to her grandfather in Florida in cash:

THE COURT: Did you -- when you made payments of $1,500 a month, did you make those payments by check?

BECICA: No, it was cash. And that was a big mistake.

THE COURT: So you sent $1,500 cash through the mail to Florida?

BECICA: Yes. Yeah.

THE COURT: Come on. Nobody does that.

BECICA: No, I'm telling you -- I would put it in an envelope –

9

THE COURT: You sent fifteen -- you sent $1,500 –

BECICA: Yes.

THE COURT: -- fifteen one hundred dollar bills in the mail to Florida?

BECICA: Yes. Yep. I don't have a bank account in my name. I don't -- you know, I just got what Nick would give me and that's what I would send. He just got a bank account. So we never had a bank account. It's a big mistake. Big mistake.

Jennifer Wilson testified that she has known Becica for over twenty years. According to Wilson, Becica first told her she paid rent to occupy the property after her mother left "a couple of years [ago]." Becica never told her the amount of rent she allegedly paid or to whom she paid it. Wilson also testified that Becica was aware of the foreclosure action and was concerned about what would happen to her. When Becica attempted to correct Wilson's testimony by saying: "I think [she's] confused," the judge immediately intervened: "No, no, no. You can't influence her testimony now."

Wilson testified that Becica had been concerned about being evicted for failure to pay rent for about year. Becica also told her she did not know to whom she was supposed to pay rent. Wilson made clear, however, that Becica never thought her grandfather or her mother would ever evict her for not paying rent.

10

On cross-examination by plaintiff's counsel, Wilson testified that she never saw Becica pay rent to anyone, or see any checks, or an envelope or packet.

At approximately 12:16 p.m., the judge noted for the record that Becica had given him three United States Postal Service money orders, each in the amount of $1000 drawn on January 9, 2018, the date of the hearing. Plaintiff 's counsel addressed the court in summation and noted the loan had been in default since November 2014. He empathized that plaintiff has paid the municipal property taxes, insurance, and other carrying costs during the entire foreclosure action. He argued Becica had "not provided any admissible evidence to indicate that she's been paying rent to anyone."

The judge began his analysis by noting that if Becica established she was "a tenant pursuant to a lease . . . [she] would be entitled to all the protections of the Anti-Eviction Act as a tenant of the property." The judge made the following factual findings:

> Let me tell you some of the negative things first. Frankly, Ms. Becica has offered me some testimony that is just shocking. I don't know how else to put it. The fact that she said that she made regular payments of $1,500 a month by sending cash through the United States Postal Service is shocking. But it's not so shocking that it's unbelievable. The [c]ourt's familiar with the fishing industry here in Cape May County, and Atlantic and Ocean Counties, as well Monmouth

11

County.  The [c]ourt knows that there's significant cash in that business, that many people are paid in cash.

And especially captains of certain boats are paid with cash.  And that cash -- it is maybe – other than maybe the diamond industry, one of the few places where cash remains king.  So while the [c]ourt expressed that it was shocked at that, I guess upon further reflection, I am not as -- I do -- it's still shocking, I'm shocked that it is done, but I can accept that Ms. Becica did that.

I also expressed some shock earlier that she didn't bring the book of receipts that showed that she had been making some payments.  Today is the day, she knew today was the day and she didn't bring that.  I'm -- you know, I expressed some shock at that, and maybe that was evidence that might have helped her convince the [c]ourt that she had been making payments.  Maybe not dispositive, and . . . certainly not determinative, but while the [c]ourt expressed some shock about that, the [c]ourt's not surprised.  And, frankly, the reason I'm not surprised is that . . . she didn't bring the receipt book, and that she sent cash through the mail, is for the following reasons.

Firstly, Ms. Becica seems like an awfully nice woman.  She's raising six children, she's doing so primarily on her own.  She at times appears to be a mess.  I don't know how else to put it, for lack of a better phrase.  I think her own testimony today is that sometimes she's a mess.

          . . . .

And she's not an attorney, she's not a professional.  She does not necessarily know how to present a case.  She doesn't know what admissible evidence is.  And she doesn't know what evidence that the [c]ourt would find

12

persuasive. I think she tried. It looks to me as if all of her paperwork is very organized. But it's not paperwork that would be convincing, or assist the [c]ourt in finding whether there was a lease or not.

So because of that, the [c]ourt's not surprised that she would send cash through the mail, and the [c]ourt's not surprised that she didn't bring evidence that might be persuasive evidence to the [c]ourt. But that doesn't mean that I'm finding against her. The issue is whether there was a lease or not. And there's circumstantial evidence that leads this -- and direct evidence that leads this [c]ourt to believe that there was a lease. <u>Number one, are the circumstances of the manner in which she became -- came into possession of the property</u>.

. . . .

Even after her mother moved out, she remained in the property. There's no evidence before the [c]ourt that at any time did Mr. Santesse attempt to sell the property, or that he attempted to make good on the mortgage, or anything like that. So I think that Mr. Santesse was probably collecting the $1,500, and was happy to do so. And he probably pocketed the money, and he never paid the mortgage. All the while. . . the [c]ourt accepts Ms. Becica's testimony that she was making the payments, with the understanding that a mortgage was likely being paid from that.

The [c]ourt finds Ms. Becica to be credible. She has tried, to the best of her ability, to give the [c]ourt straight answers. She has tried to the best of her abilities to be direct. At times she can be frustrating to get a straight answer from, but I don't feel as if she was trying to mislead me, or hide anything from me. Again, she's just not able or capable of answering direct questions sometimes. That might be because she's a

13

mess right now, and she's scared. Or it could be for other reasons I don't know about.

But I do find her to be credible, and I accept her testimony as true. The first factor I find as to why there was a lease is what I just stated, is that the circumstances that she came in and retained and continues to be in possession of the residence. The second reason, again, I said this earlier, is because Mr. Santesse never tried to sell, or listed the property for sale, there's no evidence of that before me here, so I think he would only -- he would have done that if he wasn't being paid rent, or expected to be paid rent.

Third reason I've already stated on the record also, is because even after her grandmother died and Mr. Santesse left, she remained in the property. Mr. Santesse only would have allowed that to happen if he was receiving regular payments. The fifth reason I find that there's a lease agreement, is because she has today produced $3,000 in rent. She wouldn't do that unless she felt she owed the money and that rent money, so she's willing to come up with money. She also showed me a paycheck that exceeds $1,500. She has told the Court that she's going to take that money and pay January rent.

. . . .

But for purposes of this hearing, the issue isn't whether she paid the rent. For the purposes of this hearing the issue is whether there was a lease. And the [c]ourt finds that there was a lease. For those reasons, the [c]ourt finds that there was a lease, and there is a lease. And she's going to be able to retain possession of the property as long as she continues with the lease. The lease terms have been that it's $1,500 a month. She's

14

going to have to pay $1,500 a month to her landlord, HomeBridge Financial Services.

[(Emphasis added).]

Based on these factual findings, the judge concluded Becica occupied this single-family property as a tenant, and was entitled to the protections of the Anti-Eviction Act, N.J.S.A. 2A:18-61.1 to -61.12.

II

Plaintiff argues the judge's factual findings are not supported by competent evidence and inconsistent with the undisputed salient facts. It is a bedrock principle of appellate jurisprudence that as a reviewing court, we are not at liberty to "disturb the factual findings . . . of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974). However, appellate courts do not owe any deference to legal conclusions drawn by the trial court. H.S.P. v. J.K., 223 N.J. 196, 215 (2015).

The judge relied entirely on Becica's testimony to find she occupied this property as a tenant under an "oral lease" with her maternal grandfather, Michael Santesse. Although the judge characterized her testimony that "she made regular payments of $1,500 a month by sending cash through the United States Postal

Service" as "shocking," he nevertheless found this self-serving, uncorroborated claim credible. The record shows the judge's assessment of Becica's credibility was significantly influenced by his own personal familiarity "with the fishing industry. . . in Cape May County, and Atlantic and Ocean Counties, as well Monmouth County." Thus, based exclusively on his personal awareness of these idiosyncratic, cash-based commercial practices of the fishing industry in these shore communities, the judge accepted Becica's "shocking" testimony as credible.

We conclude that the judge's findings in this respect are manifestly unsupported by the competent evidence in the record. Although the judge did not mention the doctrine of judicial notice to support his findings, we take this opportunity to briefly address the application of this rarely invoked judicial power. A judge's invocation of judicial notice is applicable under the following situations:

> (1) such specific facts and propositions of generalized knowledge as are so universally known that they cannot reasonably be the subject of dispute,
>
> (2) such facts as are so generally known or are of such common notoriety within the area pertinent to the event that they cannot reasonably be the subject of dispute,
>
> (3) specific facts and propositions of generalized knowledge which are capable of immediate

16

> determination by resort to sources whose accuracy cannot reasonably be questioned, and
>
> (4) records of the court in which the action is pending and of any other court of this state or federal court sitting for this state.
>
> [N.J.R.E. 201(b).]

A judge's personal knowledge of a cash-based culture allegedly prevalent in the southern part of our State where fishing is one of the main economic activities are outside the parameters established by N.J.R.E. 201(b) because they are facts which can be reasonably disputed, are not generally or universally known, nor easily verifiable. State v. Silva, 394 N.J. Super. 270, 275 (App. Div. 2007). We thus turn to the testimonial evidence developed at the hearing to determine Becica's legal right to occupy this property.

In Chase Manhattan Bank v. Josephson, the Supreme Court held "that N.J.S.A. 2A:18-61.3b applies the Anti-Eviction Act to foreclosing mortgagees, and thus supersedes the Court's decision in Guttenberg.[1] As amended, the Act protects tenants from eviction by foreclosing mortgagees irrespective of whether

---

[1] In Guttenberg Savings & Loan Ass'n v. Rivera, 85 N.J. 617 (1981), the Supreme Court held the Anti-Eviction Act did not protect tenants from eviction by a foreclosing mortgagee.

their tenancy was established before or after the execution of the mortgage." 135 N.J. 209, 235 (1994). N.J.S.A. 2A:18-61.3b provides, in relevant part:

> A person who was a tenant of a landlord in premises covered by [N.J.S.A.] 2A:18-61.1 may not be removed by any order or judgment for possession from the premises by the owner's or landlord's successor in ownership or possession except:
>
> (1) For good cause in accordance with the requirements which apply to premises covered pursuant [N.J.S.A.] 2A:18-61.1 et al.;
>
>      . . . .
>
> Where the owner's or landlord's successor in ownership or possession is not bound by the lease entered into with the former tenant and may offer a different lease to the former tenant, nothing in [this statute] shall limit that right.
>
> [(Emphasis added).]

Here, the dispositive legal issue before us is whether Becica proved by a preponderance of the competent evidence that she occupied this property as a tenant. She testified she was Michael Santesse's tenant and paid him $1500 per month as rent pursuant to an oral agreement established between them in or around 2015. Accepting the veracity of Becica's testimony for the purpose of this analysis, this agreement did not create an enforceable oral landlord/tenant relationship because the Santesses transferred title of the property to their

daughter (and Becica's mother) Theresa Hooks on December 12, 2012. Thus, any oral agreement related to this property Becica may had made with Michael Santesse is legally irrelevant because he was not the owner of the property.

Becica testified that her mother and her stepfather resided on the property with her and her five children for two years. Hooks separated from her husband and left the property sometime in 2017. The record shows Becica never paid rent to her mother nor established a landlord/tenant relationship with her. Based on this uncontroverted evidence, we conclude Becica is not eligible to the protections codified in N.J.S.A. 2A:18-61.3b. We reverse the order of the General Equity Part and remand the matter for enforcement of the writ of possession.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3555-17T1